**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LOUIS V. ESPOSITO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 14-954** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT
(DOC. NOS. 9 AND 11)**

**I. Introduction**

Plaintiff, Louis V. Esposito ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g)

of the Social Security Act (the "Act"), seeking judicial review of the final decision of the

Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for

Social Security disability insurance benefits ("DIB") and supplemental security income benefits

("SSI"). The parties have submitted Cross–Motions for Summary Judgment on the record

developed at the administrative proceedings. For the following reasons, Plaintiff's Motion for

Summary Judgment (ECF No. 9) will be granted in part and denied in part. The Commissioner's

Motion for Summary Judgment (ECF No. 11) will be denied, and the administrative decision of

the Commissioner will be vacated and remanded for further proceedings consistent with this

Memorandum Opinion.

## II. Procedural History

On or around February 28, 2012, Plaintiff protectively applied for DIB and SSI, alleging disability beginning January 1, 2005 due to hypertension and mental impairments. (R. 15, 82-89, 93.)[1] The alleged onset date was subsequently amended to December 1, 2005. (R. 274.) The claim was initially denied on August 9, 2012. (R. at 63-67.) Plaintiff then requested, and received, an administrative hearing, which was held on December 4, 2013 in New Castle, Pennsylvania, before Administrative Law Judge ("ALJ") John J. Porter. (R. at 61-62, 273-90.) Plaintiff, who was represented by counsel, appeared and testified at the hearing. (R. at 275-86.) Fred Monaco, an impartial vocational expert ("VE"), also testified. (R. at 286-89.) In a decision dated January 16, 2014, the ALJ determined that Plaintiff was not disabled within the meaning of the Act and denied benefits. (R. at 12-25.) The Appeals Council denied Plaintiff's request for review on May 23, 2014 (R. at 5-7), thereby rendering the ALJ's decision the final decision of the Commissioner in this case.

Plaintiff commenced the present action on July 16, 2014, seeking judicial review of the Commissioner's decision. (ECF No. 1.) Plaintiff filed a Motion for Summary Judgment on November 14, 2014. (ECF No. 9.) Defendant filed a Motion for Summary Judgment on December 17, 2014. (ECF No. 11.) These motions are the subject of this Memorandum Opinion.

---

[1] References to the administrative record (ECF No. 7), will be designated by the citation "(R. at __)."

## III. Statement of the Case

### A. The ALJ's Decision

In his decision denying Plaintiff's application for DIB and SSI benefits, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2011.  (R. 17.)

2. The claimant has not engaged in substantial gainful activity since December 1, 2005, the amended alleged onset date (20 C.F.R. §§ 404.1571 *et seq.* and 416.971 *et seq.*).  (R. at 17.)

3. The claimant has the following severe impairments:  depression and anxiety (20 C.F.R. §§ 404.1520(c) and 416.920(c)).  (R. at 17.)

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  (R. at 18.)

5. The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  the claimant is limited to simple, routine, and repetitive tasks that are not fast paced and involve only simple work decisions.  The claimant can have only incidental collaborations with coworkers and the public.  He can collaborate with supervisors for 30 minutes per workday.  Collaboration is defined as actively working together and not just being in proximity to others.  (R. 20.)

6.  The claimant is unable to perform any past relevant work (20 C.F.R. §§404.1565 and 416.965).  (R. at 23.)

7.  The claimant was born on May 6, 1962 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§404.1563 and 416.963).  (R. at 23.)

8.  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§404.1564 and 416.964).  (R. at 24.)

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).  (R. at 24.)

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).  (R. at 24.)

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2005, through the date of the decision (20 C.F.R. §§404.1520(g) and § 416.920(g)).  (R. at 25.)

**B.  Background Facts and Medical evidence**

Plaintiff is a high school graduate with past relevant work experience as a sales representative/stock worker, restaurant manager, and fast food restaurant assistant manager.  (R.

23, 94, 275-76, 287-88.)  He was 43 years old at the time of his alleged disability onset and 51

years-old as of the date of the ALJ's decision.  (R. 23, 275)

1. Treatment Notes and Assessments from the Office of Mark Matta, D.O.

Since 2003, Plaintiff has been treated at the office of Mark Matta., D.O., Psych-Med

Associates.  (R. 256-66.)  Plaintiff was initially seen once in December 2003 and January 2004

respectively, followed by a three-year hiatus.  (R. 265.)

In June 2007, Plaintiff presented with complaints that he did not have any motivation and

had to push himself to go to work.  (R. 265.)  He reported otherwise doing reasonably well.  (*Id*.)

He was started on Effexor and Seroquel and was instructed to return in 8 weeks for a re-

evaluation.  (*Id*.)  Later that summer, Plaintiff reported feeling good with his medication, but he

had also experienced two panic attacks.  (R. 264.)  Plaintiff was maintained on Effexor and his

Seroquel was increased. (*Id.*)  In addition, Plaintiff started on Klonopin in October 2007.  (*Id.*)

At that time, he was handling his panic attacks "appropriately."  (*Id.*)  The following month,

Plaintiff was still reporting panic attacks, but he felt that his medication was helping.  (*Id.*)

In December of 2007, Plaintiff reported losing his job after experiencing a panic attack at

work.  (R. 263.)  Plaintiff stated that he had made a mistake while working with machinery

which resulted in his uncle being injured and sent to the hospital.  (*Id.*)  Plaintiff was maintained

on Effexor, but his Seroquel and Klonopin dosages were increased.  (*Id.*)  In February 2008,

Plaintiff's panic attacks persisted.  He tried to work as a cook but was unsuccessful.  (*Id.*)

As of April 2008, Plaintiff's depression was under control and he was working odd jobs,

but nothing steady or stressful.  (R. 262.)  He was assessed as "stable" throughout the summer

and fall of 2008.  (*Id.*)  Between June 2008 and November 2009, he reported overall good

medical efficacy with no side effects.  (R. 260-62.)  His affect was cooperative and pleasant, his

appetite and sleep patterns were mostly normal, and there was no evidence of suicidal or homicidal tendencies, perceptual distortions, or other signs of psychosis. (*Id.*) He was diagnosed during this time with Depressive Disorder, NOS and Anxiety Disorder, NOS. (*Id.*)

In the meantime, numerous situational stressors had arisen for Plaintiff, including his daughter getting pregnant, his son being involved in a car accident, and his house being condemned. (R. 261.) In February 2010, Plaintiff reported some mild depressive symptomology and anxiety due to these increased life stressors and family discord for which he sought a medication adjustment. (R. 260.) He was in a methadone program to wean himself from pain medication that he had started taking years earlier following a car accident. (R. 260, 281-82.) Anxiety was noted, and Plaintiff was given an increased dosage of Effexor while continuing with his same dosages of Seroquel and Klonopin. (*Id.*)

Between May 2010 and February 2011, no adjustments were made to Plaintiff's medication regimen. (R. 259-60.) In August 2010, Plaintiff was using too much Klonopin and was educated on the need to comply with exact dosages. (R. 259.) Despite having mild anxiety at that time, Plaintiff was cooperative and showed no signs or symptoms of psychosis. (*Id.*) His methadone dosage continued to decrease and he was completely off methadone altogether by November 2010. (R. 259.) Although he reported some difficulty sleeping during this time, Plaintiff remained cooperative and pleasant and showed no evidence of perceptual distortions or psychosis. (*Id.*) He reported a recent diagnosis of hypertension in November 2010 but was following up with his primary care physician regarding that condition. (*Id.*) In March, 2011, Plaintiff sought emergency room treatment for heart palpitations and dizziness and was diagnosed with a panic attack. In June 2011, Plaintiff was experiencing two panic attacks daily, and his dosage of Effexor was increased accordingly. (*Id.*)

In September 2011, Plaintiff began treating with Terri Sharo, a nurse practitioner at Dr. Matto's office. (R. 258.) At that time, Plaintiff reported increased anxiety related to his wife's recent hospitalizations and problems with his grown children. (*Id.*) Despite these stressors, Plaintiff was cooperative and pleasant. His mood was neutral and anxious and his affect was congruent. Speech, sleep, and appetite were all normal. His memory, insight and judgment were all intact, and his thought process was relevant and goal directed. He displayed no thought disturbances, and his concentration and attention were good. (R. 258.) To address his anxiety, Ms. Sharo reduced Plaintiff's Effexor and increased his Klonopin. By December 2011, Plaintiff's mood was stable and his anxiety was reportedly well managed. (*Id.*) His mental status examination at that point was normal.

In March 2012, Plaintiff again reported increased stress and anxiety and decreased sleep due to his wife's poor health and his children's legal problems. (R. 258.) Ms. Sharo increased Plaintiff's Klonopin to more effectively manage his anxiety and sleep problems. (*Id.*) Despite these problems, Plaintiff remained cooperative and pleasant, with a neutral mood and congruent affect. His speech and appetite were normal, as were his concentration and attention. Plaintiff's memory, insight, and judgment remained intact, and his thought process remained relevant with no thought disturbances reported. (*Id.*)

Plaintiff continued to report increased stress in May 2012 due to nine deaths within his family in the prior month. (R. 257.) At that time, Plaintiff also reported a lack of motivation and energy as well as a tendency to put things off. (*Id.*) His sleep varied, but his appetite was normal. Plaintiff's mood was slightly dysthymic and anxious, but his mental status examination was generally unremarkable. His concentration and attention were fair. (*Id.*) Ms. Sharo restarted Plaintiff on Effexor with a plan to gradually increase his dosage and, if this did not

improve his motivation and energy, possibly add Wellbutrin SR to his regimen. Plaintiff's other medications were continued without change. (*Id.*)

By August 2012, Plaintiff reported doing fairly well on his current medications and denied any depression. He still experienced ongoing anxiety in varying degrees but was managing it fairly well. (R. 257.) His sleep and appetite were fair and that point and his mood was fairly stable. (*Id.*) Plaintiff remained cooperative and pleasant with a neutral mood and congruent affect. His memory, insight and judgment remained intact, and his thought process remained relevant and logical. Concentration and attention remained fair. (*Id.*) There were no further medication adjustments between August and December 2012, as his anxiety continued to be fairly well-managed. (*Id.*) As of December 2012, Plaintiff's sleep and appetite were good, and he reported minimal depression. A mental status examination revealed that Plaintiff had intact memory, insight and judgment, and good concentration and attention. His thought process remained relevant, and there were no thought disturbances. (*Id.*)

In January 2013, Ms. Sharo completed a psychiatric impairment questionnaire, co-signed by Dr. Matta, in which she reported that Plaintiff was experiencing ongoing anxiety daily, and some residual symptoms of depression that were fairly well managed. (R. 248.) Ms. Sharo assigned Plaintiff a good prognosis and a current GAF score of 60. (R. 248.) Her clinical findings included sleep and mood disturbances, emotional lability, decreased energy, anhedonia/pervasive loss of interests, and generalized persistence anxiety. (R. 249.) In addition, she found that Plaintiff experienced difficulty thinking or concentrating and became more socially withdrawn and isolated with increased symptoms. (*Id.*) Plaintiff's primary symptoms were lack of motivation/energy, procrastination, ongoing sleep disturbance, ongoing anxiety, and dysthymia. (R. 250.) He was moderately limited in his ability to remember locations and work-

like procedures, perform one and two-step instructions, and make simple work-related decisions. (R. 251-52.) However, Ms. Sharo considered Plaintiff "markedly limited" in his ability to: (i) understand, remember, and carry out detailed instructions, (ii) maintain attention and concentration for extended periods; (iii) maintain regular attendance, (iv) sustain an ordinary routine without supervision; and (v) work around others without being distracted. (R. 251.) Ms. Sharo further opined that, due to episodes of increased depression, Plaintiff was unable to maintain routine employment. (R. 251.) With regard to his social interactions, Ms. Sharo felt that Plaintiff might show marked limitations in his ability to get along with co-workers or peers, depending on his level of anxiety or depressive symptoms. (R. 252.) With regard to adaption, Ms. Sharo rated Plaintiff as markedly limited in his ability to set realistic goals or make plans independently. (R. 253.) She felt that, if Plaintiff experienced increased stressors, he would tend to decompensate. (*Id.*) Although Ms. Sharo did not consider Plaintiff to be a malingerer, she felt that he was incapable of even "low stress" work due to his inability to cope with any additional stressors. (R. 254.) She opined that Plaintiff would likely miss work at least three times per month because of his symptoms. (R. 255.)

Ms. Sharo continued to see Plaintiff every 2 to 3 months in 2013. (R. 256.) In March and May, Plaintiff was experiencing difficulty sleeping and variable anxiety due to multiple stressors. Despite his difficulties, Plaintiff felt that his medications had been fairly effective. His memory, insight and judgment remained intact and his thought processes and speech continued to be normal. His concentration and attention ranged from fair to good. Ms. Sharo started Plaintiff on Ambien to help him fall asleep. (*Id.*) In August 2013, Plaintiff reported that his wife had recently died, but he was receiving good support. (R. 256.) His medication continued to be fairly effective in helping him cope. Plaintiff was experiencing minimal situational depression

and increased anxiety, which he acknowledged as normal for the circumstances. His sleep and appetite were fair at that point, and his mood was slightly dysthymic, but his affect was congruent. Plaintiff's speech and thought process continued to be normal, and his memory, insight and judgment were still intact. His concentration and attention were considered fair. Ms. Sharo planned to continue Plaintiff's medication regimen without further change, but she discussed the benefits of counseling with him. (*Id.*)

### 2. Martin Meyer, Ph.D.

In June 2012, Plaintiff was evaluated by consulting psychologist Martin Meyer, Ph.D. (R. 201-04.) Plaintiff's daily activities at that time consisted of watching television, caring for his sick wife, and making dinner. (R. 201.) Plaintiff was also capable of cleaning, maintaining his personal hygiene, maintaining his residence, and paying bills. (R. 197.) Plaintiff was fearful of using public transportation or grocery shopping and would take someone with him. (*Id.*) His depressive symptoms included a loss of pleasure or interest in most activities, weight fluctuations, trouble falling asleep, feelings of fatigue, worthlessness and guilt, loss of energy, and diminished ability to think, concentrate or make decisions. Plaintiff also reported a nearly constant presence of moderate anxiety. (R. 202.)

In his mental status examination, Plaintiff maintained minimal eye contact and displayed a restricted and blocked mood and a flat affect. He was soft spoken but cooperative. (R. 203.) Dr. Meyer found no evidence of perceptual disturbances, and his thought process was normal and relevant with coherent language. (*Id.*) There were no signs of blocking in expression of thought or tangential thinking, flight of ideas, loosening of associations, or delusional thoughts. Plaintiff did appear to ruminate excessively about his family and youth and obsess over general worries and his wife's health. He displayed an overabundant fear or phobia of being in public.

He was unable to perform serial subtraction and his ability for sustained concentration was thought to be poor. (R. 203.) He could recall six digits forward and two backward. (R. 204.) Although Plaintiff was fully alert and oriented and could recall recent events, his train of thought was occasionally interrupted and his thinking was cloudy. (R. 203-04.) He tended to forget the location or placement of objects. (R. 204.) Impulse control and judgment were appropriate but his insight was limited. (*Id.*) Based on his mental examination, Dr. Meyer assigned Plaintiff a GAF score of 50. His Axis I diagnosis was panic order with agoraphobia, dysthymic disorder, post-traumatic stress disorder, and caffeine abuse. (R. 204.) Plaintiff received a poor prognosis in terms of higher level functioning and personality integration. (*Id.*)

On an accompanying assessment form, Dr. Meyer indicated that Plaintiff was only slightly limited in his ability to understand, remember and carry out short, simple instructions, make simple work-related decisions, and interact appropriately with supervisors and respond appropriately to changes in a routine work setting. (R. 199.) Plaintiff was moderately limited in his ability to understand, remember and carry out detailed instructions. However, Dr. Meyer considered Plaintiff to be markedly limited in his ability to interact appropriately with the public and co-workers and respond appropriately to work pressures in a usual work setting. (R. 199.) Dr. Meyer also felt that Plaintiff coped poorly with stress and would therefore experience "overwhelm" and have poor ability to perform within a schedule, maintain a routine, or perform at a consistent pace. (R. 198.)

### 3. Phyllis Brentzel, Psy.D.

In August 2012, Phyllis Brentzel, Psy.D., conducted a review of Plaintiff's records and assessed his corresponding functional limitations. Dr. Brentzel opined that Plaintiff has moderate limitations in his social functioning and ability to maintain concentration, persistence

or pace, as well as mild limitations in his activities of daily living. (R. 229.) According to Dr. Brentzel, Plaintiff was moderately limited in the following areas: remembering locations and work-like procedures; understanding, remembering and carrying out detailed instructions; maintaining extended periods of attention and concentration; performing within a schedule; maintaining regular attendance and punctuality; working around others without causing or suffering undue distraction; completing a normal workday/workweek and performing at a consistent pace without excessive interruptions; interacting appropriately with the public; and responding appropriately to changes in the work setting. (R. 232-33.) Notwithstanding these moderate limitations, Dr. Brentzel opined that Plaintiff can meet the basic mental demands of competitive work on a sustained basis. (R. 234.) More specifically, Dr. Brentzel opined that Plaintiff could perform simple, routine, repetitive work in a stable environment such as production oriented jobs that require little independent decision-making. (*Id.*)

## C. Hearing testimony

At the administrative hearing, Plaintiff testified about his symptoms and the resulting limitations that interfere with his ability to function. Plaintiff stated that he was last employed as a restaurant chef in 2005 but was fired after calling off work due to his symptoms and forgetting how to do things properly at work. (R. 277-78.) After that, he attempted to work at flea marketing but was unsuccessful because of his panic attacks and depression. (R. 276.) He testified that, most days, he can't get over his depression and feelings of dread and can't motivate himself to get anything done. (R. 280-81.) If he forces himself to go to the store, he gets panic attacks. (R. 280.) Plaintiff stated that he is afraid to drive because of his panic attacks; consequently, he has not driven in six or seven years. (*Id.*) Sometimes he is depressed for the whole week and some weeks he has a couple of good days, but he never knows until he wakes up

in the morning.  (R. 281, 283.)  Plaintiff claimed that his medications were initially effective but the dosages have been increased to the maximum level and are now less effective.  (R. 283-84.) He stated that he has lost all of his friends and is alone during the day.  (R. 284.)  His children will stop in to check on him occasionally and will take him to the grocery store or some other place, but he otherwise chooses to be alone because being around others induces feelings of dread or panic.  (R. 284-85.)   He has memory deficits about what he watches on television and has to record events on his calendar.  (R. 279, 285.)  He also has high blood pressure, but he admits this does not limit his functioning.  (R. 286.)

At the hearing, the vocational expert was asked to assume an individual with Plaintiff's level of education, training and work experience who could work at any exertional level but was limited to simple, routine and repetitive tasks that are not fast paced.  This individual could only make simple work decisions, have incidental collaboration with co-workers or the public, and could collaborate with a supervisor only 30 minutes per workday, with "collaboration" meaning actively working together, as opposed to simply being in close proximity to others.  (R. 288.) The vocational expert opined that the hypothetical individual could perform jobs existing in substantial numbers in the national economy – specifically, surveillance system monitor, hand packer, or industrial cleaner.  (R. 288-89.)  The vocational expert further opined that the hypothetical individual could not perform any jobs in the national or local economy if he missed work 50 percent of the time.  (R. 289.)

## IV. Standard of Review

This Court's review is limited to determining whether the Commissioner's decision is "supported by substantial evidence."  42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).  The Court may not undertake a *de novo* review of the Commissioner's decision or

re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2) (A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions, he or she must make specific findings of fact. *Stewart v. Sec'y*

*of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983).  The administrative law judge

must consider all medical evidence contained in the record and provide adequate explanations

for disregarding or rejecting evidence.  *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d

Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated

rule making authority, has promulgated a five-step sequential evaluation process for the purpose

of determining whether a claimant is "disabled" within the meaning of the Act.  The United

States Supreme Court has summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will
> not review the claim further.  At the first step, the agency will find non-disability
> unless the claimant shows that he is not working at a "substantial gainful
> activity."  [20 C.F.R.] §§ 404.1520(b), 416.920(b).  At step two, the SSA will find
> non-disability unless the claimant shows that he has a "severe impairment,"
> defined as "any impairment or combination of impairments which significantly
> limits [the claimant's] physical or mental ability to do basic work activities."  §§
> 404.1520(c), 416.920(c).  At step three, the agency determines whether the
> impairment which enabled the claimant to survive step two is on the list of
> impairments presumed severe enough to render one disabled; if so, the claimant
> qualifies.  §§ 404.1520(d), 416.920(d).  If the claimant's impairment is not on the
> list, the inquiry proceeds to step four, at which the SSA assesses whether the
> claimant can do his previous work; unless he shows that he cannot, he is
> determined not to be disabled.  If the claimant survives the fourth stage, the fifth,
> and final, step requires the SSA to consider so-called "vocational factors" (the
> claimant's age, education, and past work experience), and to determine whether
> the claimant is capable of performing other jobs existing in significant numbers in
> the national economy.  §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's

decision cannot be affirmed on a ground other than that actually relied upon by the agency in

making its decision.  In *SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995

(1947), the Supreme Court explained:

When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n.7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

**V. Discussion**

In this appeal, Plaintiff challenges the ALJ's RFC determination, which is based largely on Dr. Brentzel's opinion that Plaintiff is, at most, moderately limited in his mental functioning but can nevertheless meet the basic mental demands of competitive work on a sustained basis, provided that he is limited to simple, routine, repetitive work in a stable environment. Consistent with this opinion, the ALJ determined that Plaintiff can perform simple, routine, and repetitive tasks that are not fast paced, that involve only simple work-related decisions, and that do not involve more than incidental collaboration with co-workers or members of the public or more than 30 minutes of collaboration daily with a supervisor.

Plaintiff argues that, in reaching his RFC determination, the ALJ failed to properly evaluate the medical evidence as well as Plaintiff's subjective complaints. The Commissioner counters that the ALJ properly evaluated the evidence and that his decision is supported by substantial evidence in the record. The Court finds that Plaintiff's objections are well-taken.

## A. The ALJ's Evaluation of the Medical Evidence

Plaintiff first argues that the ALJ failed to properly weigh the medical opinions of Dr. Matta and Nurse Practitioner Sharo, as set forth in the January 2013 psychiatric impairment questionnaire. In her responses to the questionnaire, which were co-signed by Dr. Matta, Ms. Sharo opined that Plaintiff has marked limitations in his ability to maintain attention and concentration for extended periods of time, maintain regular attendance, sustain an ordinary routine without supervision, and work in close proximity to others. Ms. Sharo stated that Plaintiff is not a malingerer, but she nevertheless felt that he could not tolerate even low stress work due to ongoing personal and social stressors and that he would likely be absent from work more than three times per month. (R. 248-55.) These particular limitations, endorsed by Dr. Matta, were not credited by the ALJ or reflected in the ALJ's hypothetical question to the vocational expert.

It is well established that an ALJ should give treating physicians' opinions great weight, "'especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Brownawell v. Comm'r of Soc. Sec.,* 554 F.3d 352, 355 (3d Cir. 2008) (*quoting Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)). Even where a treating source is not entitled to controlling weight, it is "'still entitled to deference and… [in] many cases … will be entitled to the greatest weight and should be adopted…'" *Williams v. Barnhart,* 211 F. App'x 101, 103 (3d Cir. 2006) (quoting SSR 96-2p) (alteration and ellipsis in the original). Where the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "'cannot reject evidence for no reason or for the wrong reason.'" *Morales,* 225 F.3d at 317 (*quoting Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)). "In choosing to reject the treating physician's

assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales,* 225 F.3d at 317-18 (internal quotation marks and citations omitted).

Here, the ALJ considered the January 2013 mental RFC assessment by Dr. Matta and Ms. Sharo, but he gave it little weight because he considered it "inconsistent with the claimant's clinical notes, which showed the claimant's psychotropic medication regimen was effective in controlling his symptoms and that he had no side effects. Moreover, his mental status examinations were consistently within normal limits." (R. 23.) Plaintiff contends that the ALJ erred in inferring that he would be stable in a work environment simply because he demonstrated stability at his doctor's office or at home by himself. The Court agrees.

In *Morales,* the Third Circuit Court of Appeals held that it was error for the ALJ to reject the opinion of the plaintiff's treating physician based on notations that the plaintiff was stable with medication. As the court explained:

> [t]he relevant inquiry with regard to a disability determination is whether the claimant's condition prevents him from engaging in substantial gainful activity. See 42 U.S.C. § 423(d)(1)(A). For a person, such as Morales, who suffers from an affective or personality disorder marked by anxiety, the work environment is completely different from home or a mental health clinic. Dr. Erro's observations that Morales is "stable and well controlled with medication" during treatment does not support the medical conclusion that Morales can return to work. Dr. Erro, despite his notation, opined that Morales's mental impairment rendered him markedly limited in a number of relevant work-related activities. Other information in the treatment records supports this opinion. Thus, Dr. Erro's opinion that Morales's ability to function is seriously impaired or nonexistent in every area related to work shall not be supplanted by an inference gleaned from treatment records reporting on the claimant in an environment absent of the stresses that accompany the work setting.

225 F.3d at 319. The court in *Morales* cautioned that "[t]he principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case

involving a mental disability." *Id. See also Williams,* 211 F. App'x at 104 (3d Cir. 2006) (noting that, "in *Morales,* we determined that it is not proper to reject a psychiatrist's opinion based on a notation that the patient is 'stable with medication.'") (*quoting Morales*, 225 F.3d at 319). Thus, "[a] conclusion that a disorder is controlled with medication does not support a conclusion that a patient can work." *Williams,* 211 F. App'x at 104. These principles apply in the instant case and lead this Court to conclude that the ALJ erred in his assessment of the opinions expressed by Dr. Matta and Ms. Sharo in their January 2013 responses to the Psychiatric Impairment Questionnaire.

The ALJ's other basis for rejecting Ms. Sharo's and Dr. Matta's medical opinions was his conclusion that Plaintiff's mental status examinations were "consistently within normal limits." (R. 23.) As the commissioner notes, it is appropriate for an ALJ to evaluate a treating source's opinion based on the extent to which the opinion is consistent with the longitudinal record and the source's own findings. *See Becker v. Comm'r of Soc. Sec.,* 403 F. App'x 679, 686 (3d Cir. 2010); 20 C.F.R. §§404.1527(c), 416.927(c). However, it is not clear in this case that Ms. Sharo's and Dr. Matta's opinions were actually inconsistent with their own treatment records or the longitudinal treatment record in general. During his mental status exams, Plaintiff was generally noted to be pleasant and cooperative with normal speech, normal appetite, intact memory, relevant and goal-directed thought, fair-to-good concentration, no suicidal ideation, and intact judgment and insight. It is not evident, however, and the ALJ did not explain, how these findings are inconsistent with the treating sources' opinions that Plaintiff would nevertheless decompensate under the pressure of even low stress work due to his ongoing anxiety and would likely miss more than three work days per month. Nor is it evident how the mental status examination findings are inconsistent with the treating sources' opinion that Plaintiff would be

markedly limited in his ability to maintain attention and concentration for *extended* periods of time, maintain regular attendance, or sustain an ordinary work routine. *See Williams v. Colvin,* 2015 WL 22107, at *4 (E.D. Pa. Jan. 15, 2015) (noting that a claimant's RFC is his or her ability to do physical and mental work activities on a "sustained basis" despite limitations from impairments) (citing authority). *See also Brownawell,* 554 F.3d at 356 (a physician's assessment that a claimant had good focus, good attention and good concentration at the time of her examination was not necessarily inconsistent with the physician's opinion that the claimant had no ability to maintain attention or concentration for purposes of functioning in a work setting). All of the foregoing considerations lead this Court to conclude that the ALJ erred in his assessment of the medical opinions offered by Plaintiff's treating sources.

The Court also agrees with Plaintiff that the ALJ erred in discounting the findings of his examining psychologist, Dr. Meyer. In his June 2012 report, Dr. Meyer diagnosed panic disorder with agoraphobia, dysthymic disorder, and post-traumatic stress disorder. (R. 204.) Dr. Meyer opined that Plaintiff's ability for sustained concentration was poor (R. 203) and that Plaintiff displayed marked limitations in his ability to interact appropriately with the public and coworkers and respond appropriately to work pressures in a usual work setting. (R. 199.) Dr. Meyer also indicated that Plaintiff coped poorly with stress and would therefore experience "overwhelm" and have poor ability to perform within a schedule, maintain a routine, or perform at a consistent pace. (R. 198.) He assigned Plaintiff a poor prognosis in terms of higher level functioning and personality integration. (R. 204.)

As Plaintiff notes, the ALJ did not appropriately weigh the fact that Dr. Meyer's opinions in the foregoing areas were significantly corroborative of the opinions of Dr. Matta and Ms. Sharo. In fact, the ALJ failed even to acknowledge or discuss Dr. Meyer's findings relative to

Plaintiff's general inability to engage in sustained concentration, perform within a schedule, maintain a routine, or perform at a consistent pace. This alone constitutes reversible error. *See Fargnoli v. Massanari,* 247 F.3d 34, 42 (3d Cir. 2001) (recognizing "a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions" where there is "conflicting probative evidence in the record" and recognizing that the court will vacate or remand a case "where such an explanation is not provided.").

As for Dr. Meyer's opinion that Plaintiff was markedly limited in terms of interacting appropriately with the public and co-workers and responding appropriately to work pressures, the ALJ *did* acknowledge these opinions but he gave them little weight because "Dr. Matta's records demonstrated the claimant's psychotropic medications were effective in controlling his symptoms and that his mental status examinations were consistently within normal limits despite multiple situational stressors." (R. 23.) As the Court has already discussed, the ALJ committed error in drawing inferences about Plaintiff's ability to work based on treatment notes indicating that medication stabilized his symptoms. *See Morales,* 225 F.3d at 319; *Williams,* 211 F. App'x at 104. In addition, the ALJ failed to explain how Plaintiff's mental status examination results meaningfully contradicted Dr. Meyer's specific findings about Plaintiff's limitations in the areas of social functioning, sustained concentration, and task persistence. *See Brownawell,* 554 F.3d at 356 (discussing the distinction between a doctor's assessments for purposes of treatment and the doctor's ultimate opinion as to the claimant's limitations in a work-like setting).

The ALJ also based his assessment of Dr. Meyer's opinion on the fact that "the claimant was not entirely forth coming about his drug history." (R. 23.) According to the ALJ, "[t]he claimant told Dr. Meyer that he had not used any drugs since his early twenties, but the records reflect the claimant was prescribed Methadone in 2008." (*Id.*) It is not clear to the Court how

this observation, even if accurate, justifies the ALJ's rejection of Dr. Meyer's opinion concerning Plaintiff's functional limitations.

Plaintiff also objects to the ALJ's reasoning for rejecting Dr. Meyer's GAF assessment. Dr. Meyer's Axis V diagnosis assessed a GAF score of 50 for Plaintiff, which is generally considered to be "indicative of serious symptoms or any serious impairment in social, occupational, or school functioning." (R. 21.) The ALJ accorded this little weight, reasoning that "it was based heavily on the claimant's subjective complaints after only one examination" and "was inconsistent with the progress notes from Dr. Matta." (*Id.*) As Plaintiff points out, however, this reasoning is undermined by the fact that Dr. Meyer made numerous objective findings in connection with his mental status examination, including his observations that Plaintiff's mood was restricted and blocked, his affect was flat, his eye contact was minimal, he was unable to perform serial subtraction, his recall of digits was limited, his train of thought was interrupted, and his thinking was clouded. (R. 201-04.)

In performing his assessment of the medical opinion evidence, "an ALJ is not free to employ his own expertise against that of an examining physician who has presented competent medical evidence… And this principle is particularly forceful in the area of mental impairments where clinical and examining sources are based on an additional level of expertise." *Brown v. Comm'r of Soc. Sec.*, No. 08-cv-1318, 2009 WL 4408014, at *10 (W.D. Pa. Nov. 25, 2009) (*citing Plummer,*186 F.3d at 429 and *Morales,* 225 F.3d at 317-19). For the reasons set forth above, the Court finds that the ALJ violated this principle in discrediting and/or failing to address portions of Dr. Meyer's report that were corroborative of the opinions of Plaintiff's treating sources and generally supportive of his claim.

Finally, the Court agrees that the ALJ erred in giving preeminent weight to the opinion of Dr. Brentzel, a non-examining psychological consultant who opined that Plaintiff is capable of meeting the basic mental demands of competitive work on a sustained basis, notwithstanding his mental impairments and resulting limitations. Generally, more weight is given to the opinion of a source who has treated or examined the claimant than to the opinion of a non-examining source. 20 C.F.R. §§404.1527(c)(1) and (2), 416.927(c)(1) and (2). Because Plaintiff's treating and examining sources generally corroborated his claims of disabling anxiety and were substantially consistent with one another, the ALJ should have accorded those opinions greater weight. *See id.* §§404.1527(c) and 416.927(c) (medical opinions are weighed depending upon the length of the treatment relationship and frequency of examination, the physician's specialty, the opinion's supportability, and the opinion's consistency with the record as a whole). Furthermore, the weight given to an opinion of a nonexamining source will depend on the degree to which that source provides supporting explanations for their opinions. *Id.* §§404.1527(c)(3), 416.927(c)(3). Here, Dr. Brentzel's opinion should have been given less weight because it consisted mostly of checked boxes without significant analysis or discussion of Plaintiff's longitudinal treatment records. The ALJ's decision to give preeminent weight to Dr. Brentzel's opinion was all the more inappropriate given that Dr. Brentzel rendered her opinion in August 2012 without the benefit of the January 2013 assessment provided by Dr. Matta and Ms. Sharo. *See* 20 C.F.R. §§404.1527(c)(3), 416.927(c)(3) (stating that the Commissioner "will evaluate the degree to which [nonexamining source] opinions consider all of the pertinent evidence …, including opinions of treating and other examining sources"). In sum, because Dr. Brentzel's medical opinion is contradicted by the opinions of Plaintiff's treating and examining sources, which were generally supportive of his claim that he lacks the capacity to perform any type of

sustained employment on a regular basis, the ALJ's RFC assessment is not supported by substantial evidence. *See Brownawell,* 554 F.3d at 357 (noting that the Third Circuit Court of Appeals has "consistently held that it is improper for an ALJ to credit the testimony of a consulting physician who has not examined the claimant when such testimony conflicts with testimony of the claimant's treating physician") (*citing Dorf v. Bowen*, 794 F.2d 896, 901 (3d Cir.1986)).

### B. The ALJ's Evaluation of Plaintiff's Subjective Complaints

Plaintiff next argues that the ALJ erred in assessing his subjective complaints, which include (among other things) an alleged lack of motivation, feelings of dread, and attempts to avoid panic attacks by staying at home alone. (R. 279-81, 283-85.) The ALJ found that:

> [a]lthough the claimant has described daily activities that are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be verified with any reasonable degree of certainty. Second, even if the claimant's daily activities are truly limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Overall, the claimant's reported limited daily activities are considered to be outweighed by other factors discussed in this decision.

(R. 22.)

The Commissioner's administrative rulings state that "[w]hen evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p. The ruling further states that the "determination ... *must contain specific reasons for the finding on credibility*, supported by the evidence in the case record, and must be sufficiently specific to make clear to ... any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p (emphasis added). SSR 96-7p is

binding on the Commissioner, 20 C.F.R. § 402.35(b)(1). *See also Yerk v. Astrue,* No. 2:07–cv–1601, 2009 WL 185991, at *6 (W.D. Pa. Jan. 26, 2009) (The reasons for the ALJ's credibility determination "must be grounded in the evidence … and must be sufficiently specific to indicate which evidence has been rejected and which has been relied upon as the basis for the finding.") (*citing Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 433 (3d Cir. 1999)).

Plaintiff argues that the ALJ's assessment was inadequate because the ALJ did not explain why this case is different from any other case in which the ALJ is unable to "verify" Plaintiff's account of his limited daily activities. Moreover, Plaintiff argues that the ALJ did not give any reasonable justification for finding it "difficult to attribute" his limited ADLs to his depression and anxiety, especially where Plaintiff's doctors unequivocally opined that his symptoms leave him unable to meet the attendance requirements of a regular job.

The Court agrees that the ALJ's credibility determination is not supported by substantial evidence. It is clear from the ALJ's reasoning that his credibility determination was premised in large part on his assessment of the medical evidence and the extent to which he perceived that Plaintiff's subjective complaints were supported by the objective medical evidence. Given the Court's determination that the ALJ erred in his evaluation of the medical opinion evidence, it follows that the ALJ's credibility determination lacks the support of substantial evidence. Moreover, the ALJ's errors in assessing the medical evidence and Plaintiff's subjective complaints resulted in hypothetical that did not incorporate all of Plaintiff's relevant limitations. As a result, the ALJ's disability determination is not supported by substantial evidence. *See Martin v. Comm'r of Soc. Sec.*, 547 F. App'x 153, 161 (3d Cir. 2013) ("A hypothetical question posed to a VE 'must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial

evidence.'") (*quoting Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir.1987)).  The Court will therefore remand this case so that appropriate weight can be accorded to this evidence, in light of the other evidence of record.[2]

## VI. Conclusion

Based upon the foregoing, the Court finds that the Plaintiff's Motion for Summary Judgment must be denied to the extent it seeks the reversal of the Commissioner's decision and an award of benefits in her favor.  However, Plaintiff's Motion for Summary Judgment will be granted to the extent it seeks a remand of this matter back to the ALJ for further consideration of Plaintiff's application for benefits.  Accordingly, Plaintiff's Motion for Summary Judgment (ECF No. 9) will be granted in part and denied in part; Defendant's Motion for Summary Judgment (ECF No. 11) will be denied; and the decision of the ALJ will be vacated and remanded for further proceedings consistent with this Memorandum Opinion.

An appropriate Order follows.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc: All Registered ECF Counsel and Parties

---

[2] The Court notes that there may be an issue as to whether Plaintiff's disability commenced in 2007 rather than in 2005 based on the Plaintiff's lack of psychiatric treatment between 2004 and 2007.  Such an issue, if it exists, can be addressed on remand.